

# NUMBER 13-19-00205-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

FRANCISCO ESCOBEDO,                               **Appellant,**

**v.**

THE STATE OF TEXAS,                                  **Appellee.**

### On appeal from the 148th District Court of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Benavides and Hinojosa
### Memorandum Opinion by Justice Benavides

By three issues, appellant Francisco Escobedo challenges his conviction for aggravated sexual assault of a child under the age of six, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(b). Escobedo argues that (1) his trial counsel was ineffective; (2) the State violated its *Brady* obligations, *see Brady v. Maryland*, 373 U.S. 83 (1963); and (3) cumulative error caused harm. We affirm.

## I.    BACKGROUND

### A.    Procedural History

Escobedo's case has been before this Court multiple times. Following his conviction by a jury, Escobedo filed a notice of appeal and a motion for new trial. The trial court granted Escobedo's motion for new trial after a hearing, and the State appealed. *See State v. Escobedo*, No. 13-16-00684-CR, 2018 WL 6627321, at *1 (Tex. App.—Corpus Christi–Edinburg Dec. 19, 2018, no pet.) (mem. op., not designated for publication) (*Escobedo II*). During that same time, Escobedo filed a motion with this Court asking us to stay proceedings during the pendency of the State's appeal. *See Escobedo v. State*, No. 13-16-00590-CR, 2017 WL 3431828, at *1 (Tex. App.—Corpus Christi–Edinburg Aug. 10, 2017, no pet.) (mem. op., not designated for publication) (*Escobedo I*). We denied Escobedo's motion to stay and dismissed his appeal for want of jurisdiction. *Id.*

In the State's appeal, the State argued that the trial court abused its discretion for granting a motion for new trial based on ineffective assistance of counsel and an alleged *Brady* violation. *See Escobedo II*, 2018 WL 6627321 at *1. We agreed with the State, vacated the trial court's order granting a new trial, and reinstated Escobedo's conviction. *Id.* This appeal stems from the jury's conviction of Escobedo.

### B.    Evidence at Trial

Escobedo was indicted for sexually assaulting G.E.,[1] a child under the age of six

---

[1] We use initials for the minor and her family members in order to protect her identity. *See* Tex. R. App. P. 9.8 cmt. ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases.").

years old. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(b).[2] During the guilt-innocence phase of his 2016 trial, the State called (1) G.E.; (2) L.U., G.E.'s mother; (3) J.U., her grandmother; (4) D.U., her grandfather; (5) Officer Steven Moran with the Corpus Christi Police Department; (6) Detective J.R. Rodriguez with the Corpus Christi Police Department; (7) forensic nurse Sandra Pardo; and (8) licensed counselor Danea Mickey.

G.E., who was six years old at the time of trial, testified that her father, Escobedo, whom she referred to as "Frank," "did something bad to her" when she lived with him as a four-year-old. She told the jury that Escobedo touched her "private area" and butt with his "private area" more than once. G.E. explained that he would take her clothes off, put his "private area" in her "private area," that she did not like it and it was "uncomfortable," and he told her not to tell anyone. G.E. said she felt "safe" at her grandmother's house and told J.U. so the abuse would stop. G.E. also stated that Escobedo would show her videos on his phone of adults performing sexual acts. G.E. stated she asked Escobedo to stop, but the abuse continued.

The trial court held a hearing outside the presence of the jury where the State sought to introduce J.U. as an outcry witness. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (stating that an outcry witness is the first adult to whom the child describes being the victim of certain crimes, including many sexual crimes). After hearing her testimony, the trial court designated J.U. as an outcry witness and allowed her to testify regarding G.E.'s statements. J.U. testified she would watch G.E. when G.E.'s mother worked,

---

[2] The minimum term of imprisonment in this case was increased to twenty-five years to life without parole because the complainant was younger than six years of age at the time that the offense was committed. *See* TEX. PENAL CODE ANN. § 22.021(f)(1).

3

mostly at night or on the weekends. She explained that on September 9, 2014, while G.E. was showering at her house, G.E. stated, "Grandma, can I tell you something . . . . you promise you won't get mad, Grandma . . . [Escobedo]'s been putting his pee pee on my pee pee." J.U. said that G.E. seemed afraid to tell her, so she did not ask any more questions of G.E. and waited until L.U. returned home from work. J.U. told both L.U. and D.U., and L.U. went to her home to speak to Escobedo. J.U. explained that G.E. later told her additional information regarding watching the adult videos and described how the sexual assault "burned." J.U. also testified that L.U. had described to her that G.E. was "sore down there" and would "hold herself down there." After G.E.'s outcry, J.U. said G.E.'s behavior "made sense." J.U. explained that Escobedo is G.E.'s father, that she got along with Escobedo when L.U. and he lived together, and that children can be manipulated by adults. She stated that G.E. now has difficulty concentrating on tasks and goes to counseling.

L.U. testified that she tried to "work it out" with Escobedo because she wanted G.E. to have both of her parents in her life. She agreed with J.U. that she would ask her parents to watch G.E. while she was working, unless Escobedo was off of work. She stated she wanted things to "work out" with Escobedo until she heard G.E.'s outcry; she moved out of his home the following day. L.U. described that, when she got home from work, that J.U. told her what G.E. had said, and she went to G.E. and asked her to explain what had happened. After G.E. told her, L.U. confronted Escobedo and he said "he didn't do it," acting very "calm" and "level-headed." L.U. explained that when she looked into Escobedo's eyes, she could tell he was not telling the truth. D.U. took G.E. to the hospital

4

in the following days because L.U. was "still in shock." L.U. stated that she did not tell G.E. to "say things" in order to "punish" Escobedo. She also described a time prior to G.E.'s outcry that she had found G.E. under the bed "touching" herself. L.U. also stated on cross-examination that Escobedo does not normally have what she called a "calm" demeanor.

D.U. testified that he has a close relationship with G.E. When J.U. told him what G.E. had said, he told L.U. that if she went back to Escobedo, he would report her because he did not want G.E. back with Escobedo. He stated that the following day, a friend in law enforcement told him to take G.E. to Driscoll Children's Hospital (Driscoll) for an exam. D.U. explained that G.E. was very scared and the staff was only able to draw blood from her because she was "crying and screaming." D.U. agreed that Escobedo would watch G.E. alone on some evenings and weekends if they did not watch her. D.U. felt that G.E. is less focused and very emotional these days. He also testified that G.E. once walked in on him in the bathroom and exclaimed that D.U.'s penis was "bigger" than Escobedo's. On cross-examination, D.U. stated that Escobedo said he had "anxiety" and sometimes would have to walk outside to "cool off." He also agreed that he did not check G.E. for injuries but took her to the hospital two days after she made the outcry. D.U. also said that G.E was normally "okay" at the doctor, but when she was at Driscoll, she was hiding from the staff.

Detective Rodriguez testified that he is with the child crimes unit and set up the Children's Advocacy Center (CAC) interview for G.E. He said he spoke with L.U., as well as J.U and D.U, but Escobedo refused to give a statement. He explained that the case

5

was based on the statements of the child and the family members, and that very often, in these types of cases, there are just statements and no physical evidence. Detective Rodriguez also felt that G.E. "knew things" that a child that age should not know but agreed that she could have learned that information from someone other than Escobedo.

Pardo was the forensic nurse at Driscoll who saw G.E. She testified that G.E. could tell her why she was at the hospital and stated that Escobedo touched her sexual organ. Pardo did not observe any surface body injuries on G.E., but when she attempted to perform a genital examination, G.E. was crying, was fearful, looked at the floor, shook, and ran behind the trash can. Pardo stated she stopped the exam at that time because the exams should be nontraumatic. She determined G.E. had been sexually abused based on the history presented. On cross-examination, Pardo told the jury that she had never seen a patient hide behind the trash can before and G.E.'s mental stability was more important than trying to "force" an exam. She also stated that a majority of patients that have been sexually abused do not show any injury because that area of the body heals quickly.

Mickey, G.E.'s licensed professional counselor, stated that L.U. brought G.E. to her to "help her work through things." Mickey felt that G.E. was "very advanced" for her age and had a strong sense of what "bad" was. She stated that it took five sessions before G.E. was willing to discuss what had occurred and would role play very aggressively. Mickey felt that G.E. called Escobedo "Frank" in order to not "hurt" her version of how a father should act. Mickey also believed that the behavior G.E. exhibited was consistent with abuse. On cross-examination, Mickey agreed there could be other explanations for

G.E.'s behavior. She also agreed that G.E. would want to please the adults in her life, was good at following directions, and children can makeup stories without malice. However, Mickey also stated that she normally sees more emotion when children are telling a lie and that G.E. showed no emotion because Mickey felt G.E. detached herself from the trauma of the abuse. She also explained that she had worked with children that were coached and they usually give it away, and she did not feel that G.E. was coached.

Escobedo's mother Corina Martinez, his father Frank Escobedo Jr., and his brothers Andrew and Nick Escobedo testified for the defense. Most of the family members agreed that L.U. would "have a fit" if she did not get her way on something and that G.E. did not appear uncomfortable and scared of Escobedo. Martinez stated that G.E. was not a "well-mannered child" and that L.U. taught her to "disrespect" Escobedo. Martinez also said that she did not believe that any abuse happened between G.E. and Escobedo.

Escobedo also testified in his own defense. He stated that he met L.U. in 2008 and she got pregnant with G.E. about six months after they met. He stated her family did not want him around because he was "lazy" and did not have a job. After G.E. was born, they were not together anymore, and according to Escobedo, he tried to see G.E. but L.U. would not allow him. In 2013, L.U. texted him and he met G.E. at a local park. When her family found out L.U. and Escobedo were dating again, they kicked L.U. and G.E. out and they came to live with Escobedo. G.E. calls him "Frank" like L.U. did. Escobedo denied assaulting G.E. Escobedo stated the relationship between L.U. and him fell apart in 2014 and they both began seeing other people, but that L.U. got upset when she found out he was talking to another female. Escobedo first found out about the allegations when he

7

was contacted by a detective who told him to "get a lawyer." Escobedo stated that Child Protective Services called him as well but never followed up. He explained he was "shocked" about the allegations and L.U. never came to confront him as she claimed. On cross-examination, he agreed he never went to court to seek visitation with G.E. because he did not want to pay child support. He also stated that he never watched G.E. as much as L.U.'s family testified. Escobedo said G.E. lied about the abuse and that L.U. called three days after G.E. reported the abuse and said to "stay away."

The jury convicted Escobedo of aggravated sexual assault of a child and sentenced him to forty years' imprisonment in the Texas Department of Criminal Justice–Institutional Division. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(b).

## C.    Motion for New Trial Hearing

Escobedo alleged in his motion for new trial that the Nueces County District Attorney's Office failed to comply with its discovery obligations and withheld evidence related to the CAC office. Specifically, Escobedo alleged that the District Attorney at the time was a board member of the CAC and had personal knowledge that there were "deficiencies in their interview processes and further that they had failed to meet state guidelines and standards." Escobedo alleged if he had known of these "deficiencies," defense counsel would have "employed a completely different trial strategy" and the withheld evidence was "relevant and would have resulted in a different outcome should he have presented it to the jury."

The testimony from the hearing is further discussed in our prior opinion. *See Escobedo II*, 2018 WL 6627321 at *4–6. This appeal followed.

## II.    ALLEGED *BRADY* VIOLATION

By his second issue, which we address first, Escobedo alleges that the Nueces County District Attorney's Office failed to comply with its article 39.14 of the code od criminal procedure and *Brady* discovery requirements. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14; *Brady*, 373 U.S. at 83.

### A.    Applicable Law

The United States Supreme Court in *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Texas Court of Criminal Appeals has held that in order to find reversible error under *Brady* and *United States v. Bagley*, a defendant must show that: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). "Favorable evidence is that which, if disclosed and used effectively, 'may make a difference between conviction and acquittal.'" *Ex parte Miles*, 359 S.W.3d 647, 655 (Tex. Crim. App. 2012) (quoting *Bagley*, 473 U.S. at 676). Favorable evidence includes both exculpatory and impeachment evidence. *Diamond v. State*, __S.W.3d__, __, 2020 WL 3067582, at *7 (Tex. Crim. App. June 10, 2020).

The nondisclosure of favorable evidence violates due process only if it is "material" to guilt or punishment. *Id.* (quoting *Pena v. State*, 353 S.W.3d 797, 812 (Tex. Crim. App.

9

2011)). Evidence is material only if there is a reasonable probability that, had it been disclosed, the outcome of the trial would have been different. *Id.* Reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Materiality is determined by examining the alleged error in the context of the entire record and overall strength of the State's case. *Id.* The suppressed evidence is considered collectively, not item-by-item. *Id.*

## B.    Discussion

Here, Escobedo alleged the State withheld documents regarding the CAC. Specifically, during his motion for new trial hearing, he claimed the State should have disclosed the District Attorney's role as a board member of the CAC, a site report that stated deficiencies in the CAC, and the lack of proper training of certain CAC interviewers.

These same allegations were previously addressed by this Court in *Escobedo II*. *See* 2018 WL 6627321, at 4–8. Under the "law of the case doctrine," we are bound by the findings made in that appeal. *See State v. Swearingen*, 478 S.W.3d 716, 720 (Tex. Crim. App. 2015). There, we agreed with the State that the withheld documents would "not have changed the outcome of the guilt-innocence trial especially given that neither the State nor Escobedo offered [G.E.]'s forensic interview from the CAC into evidence or played it for the jury." *Escobedo II*, 2018 WL 6627321, at *6. Testimony during the motion for new trial hearing established that the interviewer who spoke with G.E. was not the individual who was listed as improperly credentialed in the report. *Id.* at *7. Further, even though G.E. went to the CAC and gave an interview that was mentioned during trial, G.E.'s interviewer was not called as a witness. *See id.* at *6–7. *Escobedo II* held that

10

"because the documents have no bearing on any of the guilt-innocence trial testimony, the CAC reports do not exculpate Escobedo." *Id.* at *6. Additionally, we held the undisclosed documents Escobedo complains of do not "justify, excuse or clear [Escobedo] from alleged fault of guilt" and are neither exculpatory nor useful for impeachment purposes. *Id.* Given our holding in *Escobedo II*, we overrule Escobedo's second issue.

### III.   INEFFECTIVE ASSISTANCE OF COUNSEL

By his first issue, Escobedo alleges his trial counsel was ineffective by failing to: (1) object to the State's outcry notice; (2) object to the State's intention to use the child abuse victim hearsay statement; and (3) properly cross-examine witnesses and secure rebuttal witnesses to the State's expert.

### A.   Standard of Review and Applicable Law

To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The defendant bears the burden of proving by a preponderance of evidence that counsel was ineffective. *Prine*, 537 S.W.3d at 116.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. There is a strong presumption that counse'sl

11

conduct was reasonable; strategic decisions "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012). "It is not sufficient that the appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence. Rather, the record must affirmatively demonstrate trial counsel's alleged ineffectiveness." *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). The defendant must overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance" and that the conduct constituted sound trial strategy. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

To defeat this presumption, allegations of ineffective assistance must be found in the record and trial counsel should be given an opportunity to explain his actions before being determined to be ineffective. *Prine*, 537 S.W.3d at 117. In the face of an undeveloped record, counsel should be found ineffective only if his conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

## B.    Discussion

Escobedo alleges trial counsel was deficient for not objecting to the State's outcry notice. However, the State's outcry notice is not contained in the records Escobedo designated to be provided to this Court, so we are unable to assess trial counsel's effectiveness in this regard. For this reason, we conclude that Escobedo has wavied any complaint regarding his counsel's failure to object to the outcry notice. *See* TEX. R. APP.

12

P. 33.1; *Johnson v. State*, 409 S.W.3d 738, 743 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Because it was appellant's burden to ensure a complete record on appeal, we presume that omissions support the judgment of the trial court.").

Next, Escobedo alleges trial counsel was deficient because he failed to object to the State's intention to use an outcry witness. Under article 38.072 of the code of criminal procedure, the State must give notice of its intent to call an outcry witness and provide the name and summary of the statement at least fourteen days before the proceedings begin. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072(b)(1)(A)–(C). The trial court then conducts a hearing, outside the presence of the jury, and must make a finding that the statement is reliable on the time, content, and circumstances of the statement, and that the child is available to testify. *Id.* art. 38.072(b)(2), (3). During a hearing conducted outside the presence of the jury, Escobedo's trial counsel was able to cross-examine the outcry witness, J.U. He argued to the trial court that a specific time was not determined from the incidents G.E. allegedly told J.U. of and that it was an unreliable statement. The trial court found the statement reliable and allowed J.U. to testify as an outcry witness. Nothing that Escobedo's trial counsel did would be considered deficient or fell below the objective standard of reasonableness. *See Strickland*, 466 U.S. at 688. Additionally, even though Escobedo had a hearing on his motion for new trial, this particular allegation of deficient performance was not addressed and trial counsel has not been given the opportunity to explain the reasons for his actions. *See Prine*, 537 S.W.3d at 117.

Lastly, Escobedo argues that trial counsel was ineffective because he did not properly cross-examine witnesses or find rebuttal witnesses regarding the State's

13

experts. Although Escobedo makes broad references to what experts felt were the "best practices" and asserts that "numerous doctors, as well as nurses" as well as "a friend of mine who is a Licensed Professional Counselor" would have been available to testify, there is no specific reference to who trial counsel should have called and what specifically they would have testified to. Counsel's conscious decision not to pursue or to call a witness is not insulated from review, but unless a defendant overcomes the presumption that counsel's actions were based in sound trial strategy, counsel will generally not be found to be ineffective. *See Ex parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012); *Ex parte Briggs*, 187 S.W.3d 458, 467 (Tex. Crim. App. 2005). However, again, although Escobedo had a hearing on his motion for new trial, this particular allegation of deficient performance was also not raised and trial counsel has not been given an opportunity to explain his actions. *See Prine*, 537 S.W.3d at 117. On this record, there is no way to know if this was deliberate and trial strategy or done for some other reason. *See id.* We overrule Escobedo's first issue.

## IV. CUMULATIVE ERROR

By his third issue, Escobedo alleges that the previous alleged errors cumulatively caused him harm which require a reversal. However, the Texas Court of Criminal Appeals has held that there is "no authority holding that non-errors may in their cumulative effect cause error." *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). Since we have found no error in our analysis of Escobedo's previous issues, we overrule this third issue.

14

## V.  CONCLUSION

We affirm the trial court's judgment.


GINA M. BENAVIDES
Justice


Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
8th day of October, 2020.