ACCEPTED
01-15-00366-cr
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/25/2015 3:22:54 PM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00366-CR

# IN THE COURT OF APPEALS FOR THE FIRST APPELLATE

## JUDICIAL DISTRICT OF TEXAS

## HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

11/25/2015 3:22:54 PM

CHRISTOPHER A. PRINE
Clerk

---

### TRACE ROGERS SMITH, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

## ON APPEAL FROM THE 207TH JUDICIAL DISTRICT COURT OF COMAL COUNTY, TEXAS

**Trial Court Cause No. CR2014-093**
**Honorable Jack Robison, and Don Burgess, Judges Presiding**

## BRIEF FOR THE APPELLEE

**Jennifer A. Tharp**
**Criminal District Attorney**

**By**
**Laura Burton Bates**
**SBN: 24035014**
**Assistant Criminal District Attorney**
**150 N. Seguin Avenue, Suite #307**
**(830) 221-1300**
**Fax (830) 608-2008**
**New Braunfels, Texas 78130**
**LKBTEXAS@GMAIL.COM**
**Attorney for the State**

**Oral argument is waived unless requested by the Appellant**

i

## NAMES OF ALL PARTIES

Appellant – Trace Rogers Smith

Appellee – The State of Texas

**Attorneys for the Appellant**

Mr. Manuel Rodriguez
879 W. Southcross
San Antonio, TX 78211
At Trial

Mr. Atanacio Campos
496 S. Castell
New Braunfels, TX  78130
On Appeal

**Attorneys for the Appellee**

Ms. Chari Kelly
Assistant Criminal District Attorney
Ms. Jacqueline Doyer
Assistant Criminal District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
For the State at Trial

Ms. Laura Burton Bates
Assistant Criminal District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
For the State on Appeal

Ms. Jennifer A. Tharp
Criminal District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130

# INDEX

|  |  | Page |
|---|---|---|
| I. | NAMES OF ALL PARTIES | ii |
| II. | INDEX | iii |
| III. | LIST OF AUTHORITIES | viii |
| IV. | NATURE OF THE CASE | 1 |
| V. | STATEMENT OF FACTS | 3 |
| VI. | SUMMARY OF THE ARGUMENT | 9 |
| VII. | COUNTERPOINTS | 10 |

**COUNTERPOINT NO. 1**        10
State's Reply to Appellants' Point of Error One

NO <u>BRADY</u> VIOLATION OCCURRED FOR LATE DISCLOSURE OF A WITNESS' PRIOR CONVICTION BECAUSE THE INFORMATION WAS IMMATERIAL, THE PROSECUTION'S CASE AGAINST APPELLANT WAS STRONG, AND THERE IS NO EVIDENCE THAT THE EXISTENCE OF THE PRIOR CONVICTION WOULD HAVE CHANGED THE OUTCOME OF THIS TRIAL.

ACCORDINGLY, NO ERROR IS PRESENTED AND APPELLANT'S POINT OF ERROR NUMBER ONE SHOULD BE OVERRULED AND THE JUDGMENT AFFIRMED.

| VIII. | CONCLUSION AND PRAYER | 18 |
|---|---|---|
| IX. | CERTIFICATE OF SERVICE | 19 |
| X. | CERTIFICATE OF COMPLIANCE | 19 |

# LIST OF AUTHORITIES

**CASE NAME**                                                             **PAGE**

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)……….11

Hafdahl v. State, 805 S.W.2d 396, 399 (Tex.Crim.App. 1990)……………........11

Hall v. State, 283 S.W.3d 137, 171 (Tex.App.—Austin 2009, no pet)……..........13

Hampton v. State, 86 S.W.3d 603, 612 (Tex.Crim.App. 2002)……………..…..12

Jones v. State, 711 S.W.2d 35, 38 (Tex.Crim.App. 1986)………………………13

Pena v. State, 353 S.W.3d 797, 811 (Tex.Crim.App. 2011)……………………..11

Saldivar v. State, 980 S.W.2d 475, 485 (Tex.App.—Houston [14th Dist.]

       1998, pet. ref'd)…………………………………………………………...15

Thomas v. State, 841 S.W.2d 399, 404 (Tex.Crim.App.1992)(en banc)……...11,12

U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)……………...12

U.S. v. Bagley, 473 U.S. 665, 105 S.Ct 3375, 87 L.Ed.2d 481 (1985)…………...12

Webb v. State, 232 S.W.3d 109, 115 (Tex.Crim.App. 2007)…………………12,13

**RULES AND STATUTES**                                              **PAGE**

TEX.PEN.CODE §19.03…………………………………………………………….1

TEX.PEN.CODE §20.04…………………………………………………………….1

TEX.PEN.CODE §22.021………………………………………………………...1

TEX.PEN.CODE §29.03…………………………………………………………….1

TEX.PEN.CODE §37.09…………………………………………………………….1

TEX.R.EVID. 609…………………………………………………………………13



**TRACE ROGERS SMITH**  §IN THE COURT OF APPEALS
§
**Appellant**  §
§
§
§
**v.**  § FOR THE FIRST
§
§
§
**THE STATE OF TEXAS**  §
**Appellee**  §APPELLATE DISTRICT OF TEXAS

**ON APPEAL FROM THE 207TH JUDICIAL DISTRICT COURT**
**OF COMAL COUNTY, TEXAS**
**Trial Court Cause No. CR2014-093**

To the Honorable Court of Appeals:

## NATURE OF THE CASE

Appellant was charged by indictment with one (1) count of Attempted Capital Murder, one (1) count of Aggravated Kidnapping, one (1) count of Tampering with Physical Evidence, one (1) count of Aggravated Sexual Assault, and one (1) count of Aggravated Robbery. (TEX.PEN.CODE §§19.03, 20.04, 37.09, 22.021, and 29.03). (C.R. Vol.1, pp. 9-11). A jury was empaneled on February 23, 2015. *See generally,* (R.R. Vol. 2). Ultimately, on February 27, 2015, the Appellant was found guilty by the jury of the counts of Attempted Capital Murder, Aggravated Kidnapping, Aggravated Robbery, and Tampering with Physical Evidence; Smith was found not guilty of Aggravated Sexual Assault. (C.R. Vol. 1,

pp. 64-76). The punishment phase of the trial commenced immediately following the pronouncement of the verdict, with the Appellant electing the jury to assess punishment. *Id*.

After hearing further evidence from both sides during the punishment phase, the jury assessed punishment at forty-two years in the Institutional Division of the Texas Department of Criminal Justice (TDCJ) for the Attempted Capital Murder and Aggravated Kidnapping convictions, ten years in the Institutional Division of TDCJ for the Aggravated Robbery conviction, and five years' imprisonment in the Institutional Division of TDCJ for the Tampering with Physical Evidence conviction. (C.R. Vol. 1, pp. 64-76).

## STATEMENT OF FACTS

On December 8, 2013, Appellant and his co-defendants participated in tasing, stabbing, hog-tying, and kidnapping Dana Huth, and left her for dead in a shed on a very cold night. They then proceeded to burn Huth's personal belongings she had brought with her.

Dana Huth was romantically involved with a man named Travis Nealon. (R.R. Vol. 3, pp. 43). Nealon was simultaneously romantically involved with Heather Richards, who is one of Appellant's co-defendants in this case. *Id.* Huth, Richards, Clint Barkley, Sheena Hopkins, Kayla Lardieri, and the Appellant all went to "hang out" at Mike Chapin's house on December 8, 2013, only bringing her black backpack with her. *Id* at 50-1. While they were there, Chapin, also known as "Big Mike," told Huth that Richards and Lardieri wished to speak with her in the back bedroom, and sent Huth in to see them. *Id* at 51. In that back bedroom, Richards and Lardieri began to scream at Huth and call her names, accusing her of being a "snitch" and also of having a romantic involvement with Nealon at the same time Richards was romantically involved with him. *Id* at 53-4. They then had Huth remove all her clothes to check her for a "wire." *Id* at 54. Lardieri proceeded to wrap a t-shirt around her hand and inserted her covered hand into Huth's vagina to check for a wire. *Id* at 54-55.

Richards then tased Huth and both Richards and Lardieri began stabbing Huth. (R.R. Vol. 3, pp. 55-6). They stabbed Huth on her right hand, right side, the back of her neck, inner thighs, and the back of her legs, for a total of eight stab wounds. *Id* at 57-8. After they stabbed Huth, they kicked her in the side of her head and her ribs. *Id* at 62. Throughout the attack, Hopkins videotaped the entire incident on her cell phone. *Id* at 56. Huth was able to get to the bedroom door, trying to escape, and broke a vase in the hallway. *Id* at 63. Appellant appeared and pushed Huth back into the bedroom and told the other girls they needed to "wrap it up." *Id*.

Hopkins sat on Huth while Richards and Lardieri handcuffed Huth's feet, as well as handcuffing and shackling Huth's hands. *Id* at 63, 65. They proceeded to "hog-tie" Huth's hands and feet by using shackles to connect the handcuffs at her hands and feet. *Id* at 65. Huth's hands were taped together, and a gag made from a tennis ball was inserted into her mouth. *Id* at 66. She was also blindfolded with an eye mask. *Id*. The Appellant carried her to a shed, and Chapin told the group to make sure they locked the door. *Id* at 68.

In the shed by herself, Huth was able to release her shackles around her wrists, and took off her gag and blindfold; she was not able to release the handcuffs around her feet. *Id* at 70. While her feet were still shackled, she was able to climb out a small window that was about six feet off the ground to get out of the

shed. *Id.* She crawled naked along the cold, wet grass until she was able to get to a neighbor's house across the street. *Id* at 72. She crawled up to the front porch and used her head to knock on the door. *Id* at 73. No one answered so Huth borrowed a blanket and crawled into one of the vehicles on the property to get out of the cold. *Id* at 74.

A few hours later, Huth heard Richard's vehicle drive back up to Chapin's property; Richard's SUV had a distinct sound as if it was missing a muffler. *Id* at 75. Huth heard the others go look in the shed and realize she was missing. *Id.* Later the next morning, Huth honked the horn of the vehicle she was in to get the attention of Mariah Denman, who lived on the property where Huth was hiding. *Id* at 139. Denman, after noticing Huth's condition, called the police and Huth was flown to University Hospital in San Antonio for medical treatment of her injuries. *Id* at 140.

Clint Barkley, a friend of the Appellant, testified at trial that he was at Chapin's house on the night of the attack and witnessed Appellant going "in and out" of that back bedroom repeatedly. (R.R. Vol. 3, pp. 203). He stated it sounded like a "wrestling match" was going on in that back room and he could hear the taser going off repeatedly. *Id* at 202-203. He stated that Appellant was "guarding" that door behind which the assault was occurring. *Id* at 207-8. As he was preparing

to leave the property, he saw Chapin and the Appellant standing in front of a shed outside the house. *Id* at 207.

Michael James, a friend of the Appellant, testified at trial that he had viewed the video Hopkins made of the attack on Huth. (R.R. Vol. 3, pp. 143, 145-6). He stated that in the video, he saw Huth get tackled, and Lardieri make a stabbing "gesture" and then actually stab Huth. *Id* at 146, 149.

Jerry Stovall, who was also present at Chapin's house during the attack, testified at trial that he witnessed Appellant, Huth, Lardieri, and "two other girls" all go into that back bedroom on that night. (R.R. Vol. 4, pp. 27-8). He stated that Huth was called into the back bedroom after the others were already in there and then they were arguing. *Id* at 28. Stovall left Chapin's house, but later the same evening, Appellant and Lardieri came over to Stovall's house, and Appellant had a black backpack with him. *Id* at 29.

Sheena Hopkins, one of Appellant's codefendants, also testified regarding the events of the attack. She testified that at Chapin's house that night, Appellant called Huth to come to that back bedroom to speak with Lardieri and Richards. (R.R. Vol. 4, pp. 111). Hopkins echoed the testimony of the other codefendants, stating that Richards began arguing with Huth and tased her. *Id* at 113-115. She also informed the jury that Lardieri told Huth to disrobe, then proceeded to vaginally check her for a wire, and then stabbed Huth in the leg. *Id*. Lardieri

continued to stab Huth over and over again. *Id* at 116. Hopkins told the jury that Appellant came into the back bedroom and told them to wrap it up. *Id*. Later on, Hopkins went into the living room to retrieve some handcuffs because Huth kept breaking through the electrical tape they originally used to bind her wrists. *Id* at 121. Appellant handed Hopkins the handcuffs from the living room. *Id* at 122. Importantly, she testified that Appellant had her video the entire attack, and later, after she watched the video, she witnessed Appellant holding a gun to Huth's face during the attack. *Id* at 129, 134.

Appellant testified in his defense at trial. He informed the jury that, while at Chapin's house that night, he smoked marijuana and methamphetamines. (R.R. Vol. 5, pp. 186). He, Lardieri, Hopkins, and Richards all went into the back bedroom to continue smoking methamphetamines. *Id* at 189. Appellant left the back bedroom and told Dana the other girls wanted her to go back to that bedroom to be with them. *Id*. At some point, Appellant heard things getting "physical" in that room. *Id* at 194. Lardieri came out and told Appellant that Huth was "bleeding out." *Id* at 195. Appellant stated Chapin asked if they wanted to take Huth to a pig farm." *Id* at 197. Appellant, seeing Huth bleeding, shackled, and handcuffed, tied her "into the sheet" and carried her out to the shed. *Id* at 199-200. After Appellant and Lardieri left Chapin's house, Appellant burned Huth's backpack, with all her

7

belongings inside so no one would find Huth's belongings and they wouldn't get caught. *Id* at 230.

The gag and blindfold, as well as the black eye mask, were recovered at the scene, and still had Huth's hair attached. (R.R. Vol. 3, pp. 165, 166. ) The State admitted 276 exhibits during its case in chief, ranging from photos of Huth's injuries and her medical records, to photos of the blood droplets that show the path Huth crawled from the shed to the neighbor across the street, to the burnt remains of her backpack that Appellant had burned after the attack. *See generally*, (R.R. Vol. 3-4).

## SUMMARY OF THE ARGUMENT

The Appellant has presented one (1) point of error for the Court's review. The State maintains that its failure to disclose a prior murder conviction on one of its witnesses did not violate <u>Brady</u> because the State had no knowledge of such conviction until well after Appellant's trial had concluded and the prior conviction occurred in Florida. Moreover, the prior conviction was immaterial under a <u>Brady</u> analysis because there is no argument that impeachment of the witness based on such conviction would have changed the outcome of the trial, considering the witness was in custody and testified that he was sentenced to prison.

For these reasons the State respectfully asks the court to overrule the Appellant's point of error and affirm, in all things, the conviction rendered by the jury in this matter.

# COUNTERPOINT

State's Reply to Appellants' Point of Error
Appellant's Brief pp. 10-16

NO <u>BRADY</u> VIOLATION OCCURRED FOR POST-TRIAL DISCLOSURE OF A WITNESS' PRIOR CONVICTION BECAUSE THE INFORMATION WAS IMMATERIAL, THE PROSECUTION'S CASE AGAINST APPELLANT WAS STRONG, AND THERE IS NO EVIDENCE THAT THE EXISTENCE OF THE PRIOR CONVICTION WOULD HAVE CHANGED THE OUTCOME OF THIS TRIAL.

ACCORDINGLY, NO ERROR IS PRESENTED AND APPELLANT'S SOLE POINT OF ERROR SHOULD BE OVERRULED AND THE JUDGMENT AFFIRMED.

In his sole Point of Error, the Appellant contends that error occurred when the State failed to turn over information that one of its witnesses had a prior conviction for murder, and this information was material. (Appellant's brief, pp. 10). Appellant objects that this error resulted "in an unfair trial for the defendant and a verdict unworthy of confidence." *Id* at 17.

The State notified Appellant that it was made aware in a subsequent trial, nearly four months following Appellant's trial, of a prior murder conviction out of Florida for its witness Clint Barkley. (C.R., Supp. Vol., pp. 4). The State included a copy of the Florida Appellate Court decision reversing the original conviction and remanding the case for a new trial. *Id* at 5. The State's letter indicated Barkley's

case was retried and he was subsequently convicted a second time of murder. *Id* at 4.

During the State's case-in-chief during Appellant's trial, Barkley testified before the jury while he was in custody of the Comal County Jail. (R.R. Vol. 3, pp. 200). He informed the jury that he currently lived in the Comal County Jail and had been sentenced to prison, as well as he had not been promised anything in return for his testimony at Appellant's trial. *Id.*

Brady imposes on the State a Constitutional duty to disclose to a defendant any material and exculpatory evidence. Hafdahl v. State, 805 S.W.2d 396, 399 (Tex.Crim.App. 1990); *see also* Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Brady does not dictate that the prosecution must disclose exculpatory information to the defense that the State does not have in its possession and that is not known to exist. Pena v. State, 353 S.W.3d 797, 811 (Tex.Crim.App. 2011), *quoting* Hafdahl, 805 S.W.3d at 399, n.3.

Once the Court has determined Brady applies, the next question is whether the evidence would be favorable to the defense. Thomas v. State, 841 S.W.2d 399, 404 (Tex.Crim.App.1992)(en banc). Favorable evidence is defined as any evidence, that if disclosed and utilized, may be the difference between conviction and acquittal. *Id*. Favorable evidence may include impeachment evidence as well as exculpatory evidence. Pena, 353 S.W.3d at 811. Impeachment evidence would

be used to "dispute, disparage, deny or contradict" a witness' testimony. Thomas, 841 S.W.2d at 404.

Failure to disclose evidence considered favorable violates due process only if it is "material" to guilt or punishment. U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id*. Thus, a showing must be made on appeal that "in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure." Hampton v. State, 86 S.W.3d 603, 612 (Tex.Crim.App. 2002). When evaluating materiality, the strength of the Brady evidence is balanced against the evidence supporting the conviction. *Id* at 613. It is also important to consider how disclosure could have affected defense preparation. U.S. v. Bagley, 473 U.S. 665, 105 S.Ct 3375., 87 L.Ed.2d 481 (1985).

Appellant has the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of his trial would have been different had the State timely disclosed this prior conviction. Webb v. State, 232 S.W.3d 109, 115 (Tex.Crim.App. 2007). "Reasonably probable" is defined in this regards as one that is sufficient to undermine confidence in the outcome of the trial. The mere possibility that an item of undisclosed information might have helped the defense,

or might have affected the outcome of the trial, does not establish materiality in the Constitutional sense. Webb, 232 S.W.3d at 115. To rise to the level of reversible error, Appellant must show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Hall v. State, 283 S.W.3d 137, 171 (Tex.App.—Austin 2009, no pet). Moreover, generally speaking, new evidence that is "merely cumulative, corroborative, collateral, or impeaching is rarely of such weight as to bring about a different result." Jones v. State, 711 S.W.2d 35, 38 (Tex.Crim.App. 1986).

In Hall v. State, the State failed to disclose a witness' prior conviction from New Zealand because evidence of that conviction was contained in a different file in the District Attorney's office for prosecution on different charges by a different prosecution team. Hall, 283 S.W.3d at 177. The Court rejected the "prosecution team" argument but held the undisclosed conviction in this case was immaterial. *Id.* The Court determined there was sufficient other impeachment evidence for the same witness and the State's case against the appellant was strong; thus the evidence would not have had a significant impact on the outcome of the trial. *Id*.

A. **FAVORABLE BUT IMMATERIAL**

Evidence that Barkley had a prior murder conviction would clearly be admissible impeachment evidence under Rule 609, and thus would be considered "favorable evidence" under this analysis. *See* TEX.R.EVID. 609. However, there is

no evidence or indication that the State had any knowledge of the prior conviction until a subsequent trial on one of Appellant's codefendants. At that point, Barkley volunteered the information; it was not discovered by either party prior to such admission.

### 1. STATE WAS UNAWARE OF THE PRIOR CONVICTION

The State points out that this particular situation does not mandate that it should have known of such prior conviction and was at fault for not disclosing such information. The record has no facts relating to what was in the State's file or what was notated on Barkley's criminal record. Moreover, the prior conviction was not only from a different state but had even been overturned by a Florida Appellate court and remanded for a new trial. Based on the record, there is no evidence the State had any knowledge anywhere with any person in its office regarding the prior conviction, and thus was not at fault for failing to disclose such information.

### 2. BARKLEY PRESENTED PLENTY OF OTHER IMPEACHMENT EVIDENCE ABOUT HIMSELF

Furthermore, Barkley informed the jury in Appellant's trial that he was currently residing at the Comal County Jail and had been sentenced to prison. He also informed the jury that he smoked marijuana and methamphetamines and would have used drugs at Chapin's house that night had they been offered to him.

(R.R. Vol. 3, pp. 216). Factually, Barkley presented to the jury plenty of impeachment evidence as to himself during the trial.

In Saldivar v. State, the State failed to disclose prior theft convictions of one of its witnesses at trial due to the theft convictions being listed underneath a variation of the witness' name, and thus did not show up on the original background check. Saldivar v. State, 980 S.W.2d 475, 485 (Tex.App.—Houston [14th Dist.] 1998, pet. ref'd). The Court determined that a more diligent search would have discovered the prior convictions; however, the Court held the failure to disclose the convictions was immaterial. *Id* at 486. The Court determined such failure was immaterial because there was sufficient other impeachment evidence for the same witness and the State's case against the appellant was strong. *Id*.

### 3.  THE CASE AGAINST APPELLANT WAS STRONG

The State's case against Appellant was strong. The victim's testimony that she was tased, kicked, stabbed, shackled, gagged, blindfolded, hog tied, penetrated, and left for dead in a shed was corroborated by each of Appellant's five codefendants and by the physical evidence located at the scene of the crime. Appellant himself confessed to shackling Huth, tying her into a sheet, and carrying her to the shed to leave her. He also admitted to burning Huth's personal belongings after the assault. Stovall and Barkley both testified that they saw Appellant go in and out of the back bedroom.

## 4. WOULD NOT HAVE CHANGED THE OUTCOME OF THE TRIAL

Furthermore, there is no evidence that this prior conviction, had it been timely discovered and disclosed to the jury, would have changed the outcome of the trial. Barkley already testified regarding his prison sentence he was facing, as well as the fact that he used drugs routinely and would have used drugs at Chapin's house that night, had he been offered any. His testimony did not leave the impression with the jury that he was a model citizen. Lastly, the codefendants and witnesses' testimony corroborated each other's testimony. Discounting Barkley's testimony completely, Lardieri, Hopkins, Huth, Richards, and Stovall each testified that Appellant was going in and out of the room in which the assault took place. Four of these five testified that Appellant made some movement or comment in furtherance of the attack, including his request to the girls to "wrap it up" and stick a gun in Huth's face back in the bedroom. Three of the five, plus Appellant each testified that Appellant helped tie the handcuffs and shackles in order to hog-tie Huth and get her to the shed. (R.R. Vol. 5, pp. 199).

## 5. APPELLANT'S CLAIMS

Appellant, in his brief, claims that the jury would have taken Barkley's word with more veracity than any other witness since he was not involved in the assault and had not been using drugs that evening. (Appellant's brief, pp. 15). The flaw in this argument is that Barkley had already informed the jury that he was a felon and

16

headed to prison. (R.R. Vol. 3, pp. 200). This was actually more information than was tendered to the jury on the rest of the witnesses and co-defendants. The other codefendants were merely asked if they had been promised anything in return for their testimony, as well as if they understood what testimonial immunity was. (R.R. Vol. 3, pp. 200-1 [Barkley]), (R.R. Vol. 4, pp. 106-7 [Hopkins]), *Id* at 145-6 [Richards], (R.R. Vol. 5, pp. 80-82 [Lardieri]). Not Richards, Lardieri, Hopkins, nor Appellant testified that they either had been or were headed to prison. Thus, arguably, the jury would believe Barkley the same as the rest of the witnesses who testified, or give his testimony even less weight since he readily admitted to before the jury that he was a felon. Importantly, there is no argument from Appellant how such knowledge of Barkley's prior conviction would have changed his trial strategy or impacted his line of questioning of Barkley in any capacity.

## B. CONCLUSION

The prior conviction was immaterial under the facts of this case, and irrelevant considering the strength of the State's case. There is no evidence or demonstration that had Barkley's prior conviction been timely discovered and disclosed that it would have had any impact on the outcome of the trial. Appellant's Point of Error should be overruled and the judgment of the trial court be in all things affirmed.

## CONCLUSION AND PRAYER

Wherefore, premises considered, Appellee prays that this Honorable Court of Appeals affirm in all matters the judgment of the trial court in this case.

**Respectfully submitted,**

**/s/ Laura Burton Bates**
**Laura Burton Bates**
Assistant Criminal District Attorney
Comal County Criminal District Attorney's Office
150 N Seguin Street
New Braunfels, Texas 78130
Phone: 830-221-1300
Fax: 830-608-2008
LKBTEXAS@GMAIL.COM
SBN: 24035014

**CERTIFICATE OF SERVICE**

I, Laura Burton Bates, attorney for the State of Texas, Appellee, hereby certify that a true and correct copy of this brief has been delivered to the following individual electronically, this 25th day of November, 2015.

  /s/ Laura Burton Bates
**Laura Burton Bates**

**Counsel for Appellant**

Mr. Atanacio Campos
496 S. Castell
New Braunfels, TX 78130
atanacio@aol.com

**CERTIFICATE OF COMPLIANCE**

I, Laura Burton Bates, hereby certify that this document was prepared in MS Word and it does not exceed the allowable length for an appellate brief pursuant to Tex. R. App. Pro. 9.4, as amended and adopted on November 30, 2012, by Order of the Texas Court of Criminal Appeals. The approximate total of words in this document, as calculated by the word processing software, is 4400 words.

  /s/ Laura Burton Bates
**Laura Burton Bates**